### State of Vermont v. Richard Smith a/k/a Kevin West

[396 A.2d 126]

No. 89-76

Present: Barney, C.J., Daley, Larrow, Billings and Hill, JJ.

Opinion Filed October 31, 1978

Motion for Reargument Denied November 17, 1978

*Michael J. Sheehan,* Windsor County State's Attorney, White River Junction, and *William T. Keefe,* South Burlington, for Plaintiff.

*James L. Morse,* Defender General, *Charles S. Martin,* Appellate Defender, *Robert M. Paolini,* Deputy Public Defender; and *Geoffrey Yudien* and *John Franco,* Law Clerk (On the Brief), Montpelier, for Defendant.

**Barney, C.J.** This is a prosecution for the rape of a sixteen year old babysitter and the murder of her charge, her eight year old cousin. As is so frequent in cases involving serious criminal violence, sanity is a critical issue. It is the principal concern of the appeal.

The killing is conceded, both below and here, and no issues separately contesting the rape conviction are urged here. No extended recital of facts is required. The defendant was twenty-one years old at the time of these events. The evidence disclosed that the defendant, after finding out that the babysitter was alone with her charge, went to the apartment and was admitted by the little boy while the babysitter was on the telephone. He explained his presence by claiming he had permission to borrow some records from the little boy's mother. Shortly thereafter he assaulted the babysitter and the rape occurred. Afterwards the defendant attempted to strangle the boy with a cord, then finally killed him by stabbing him with a large knife he got from the kitchen. When that happened the babysitter grabbed for the knife, cutting her hand, succeeding in knocking the defendant down, and escaped. As she ran into the street he apparently threw the knife at her but missed. The babysitter fled to a neighbor's and when the police arrived the defendant was gone. When the identity of the defendant became known, the foster family with whom he was living was contacted. He was later brought by one of them to the police station.

Almost simultaneously with the issuance of the warrant and before arraignment, the State moved for a mental examination in anticipation of a plea of insanity. That motion asserted that

the defendant had a history of treatment for personality disorders at Metropolitan State Hospital in Waltham, Massachusetts; New Hampshire Hospital in Concord, New Hampshire; and Waterbury State Hospital in Waterbury, Vermont. The motion was granted at the arraignment and the examination undertaken.

The test of responsibility for criminal conduct is set out in 13 V.S.A. § 4801:

> The test when used as a defense in criminal cases shall be as follows:
>
> (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks adequate capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
>
> (2) The terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct. The terms "mental disease or defect" shall include congenital and traumatic mental conditions as well as disease.

It was enacted as a result of a considerable concern that the former M'Naghten test was an inadequate measure to protect the interests and rights of the public and the accused. The new statute, like the so-called Durham rule, (*Durham* v. *United States,* 214 F.2d 862 (D.C. Cir. 1954)), that other jurisdictions beginning with the District of Columbia adopted, was intended to more accurately measure the legal issue of what kind of mental condition or aberration ought to excuse criminal responsibility. The language of 13 V.S.A. § 4801 derives from a formulation recommended by the American Law Institute. See ALI, Model Penal Code Proposed Official Draft, § 4.01 (1962). Progress in the diagnosis of mental health and motivation was felt to have outreached the confines of the M'Naghten standards, and the new rule was advanced and enacted as postulating a more adequate and accurate evaluation of the reasons for criminal behavior. It moved in the direction of broader psychiatric inquiry. However, it is generally recognized that the definition of the sort of mental condition that will bar conviction for otherwise criminal acts,

called "insanity" in the law, is not necessarily identical with the mental condition or conditions labelled "insanity" by psychiatry.

The raising of a defense to criminal responsibility based on insanity as defined by law has a history antedating the founding of this nation, but has always had grudging acceptance. The popular concern that it might open the way to easy acquittal of criminals was noted in *State* v. *Hanson*, 134 Vt. 227, 232, 356 A.2d 517 (1976). Implicit in that concern is the concept that there will be easy and early release from confinement for mental treatment, leaving a crime inadequately punished and, presumably, society unprotected. This understanding does not necessarily comport with the facts. See Arens, *Insanity Defense* at 45 (New York 1974).

Even so, the remedy is not to undercut or deny a defendant the right to present an issue related to his defense, sanctioned by statute, and so long acknowledged as validly part of our law. The consequences of a valid insanity defense with respect to confinement, treatment and discharge, if to be changed, are to be addressed in other governmental arenas. *State* v. *Warner*, 91 Vt. 391, 393, 101 A. 149 (1917), written more than sixty years ago reminds us that: "It is as much the duty of the state to protect an insane man from conviction, as it is to prevent a sane man from escaping that result."

It is also to be noted that once evidence of insanity appears in the case, it becomes the burden of the state to prove the defendant sane beyond a reasonable doubt. *State* v. *Miner*, 128 Vt. 55, 67, 258 A.2d 815 (1969). Even under the narrower doctrine of M'Naghten, the scope of relevant evidence as to sanity or insanity has to be allowed to be of whatever breadth is appropriate to fully expose the issue to the jury for their fair determination. Again, in *State* v. *Warner, supra*, 91 Vt. at 392, 101 A. 149, Powers, J., put it this way:

> When a respondent puts his mental condition in issue by the introduction of evidence tending to show his insanity, he opens an inquiry that may take a very wide range; how wide, depends upon the circumstances of the case in hand. (Citations omitted). Broadly speaking, his whole life may be canvassed for evidence bearing upon

the question; and his ancestry and family history may be investigated.

Although its precise application may have altered with advances in knowledge in the psychiatric field, the thrust of its logic is as relevant and forceful as ever.

Unfortunately, it did not avail in this case, and a reversal is required. The lower court, assertedly on grounds of relevance, foreclosed the presentation of evidence, offered to establish the kind and causes of the claimed mental deficiencies of the defendant. Attempts to present matters of mental history through others than psychiatrists were turned aside. Whatever their content, and no matter how little the jury might have valued them, to bar them from the trier of fact was to unlawfully shortchange a legitimate presentation of a claimed defense.

This was compounded by a position taken by the State and concurred in by the trial court with respect to part of the defendant's behavioral history. Examples of previous episodes of violent behavior were found to be relevant, but all evidence intended to relate it to some mental disease or defect was rigidly ruled out. This had the effect, before the jury, of putting such behavior within the scope of the sentence in 13 V.S.A. § 4801, already noted, that reads as follows: "The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." This exclusion becomes automatic in its operation if all evidence that the abnormality was manifested in any other way is kept out of the case. This is contrary to the intent and purpose of the statute and, in this case, had the unfortunate effect of negating the full availability of evidence relating to the defendant's mental state. See *State* v. *Hanson, supra,* 134 Vt. at 233, 356 A.2d 517.

The rejection of testimony of the lay witnesses relating to the mental condition of the defendant seems to have been based on the same inexplicable contention that the history and causes of that condition were irrelevant. Certainly it has always been the law in this state that where relevant and based upon appropriate knowledge and observation, lay testimony as to sanity or insanity is fully admissible. Presumably,

on retrial, this issue will be dealt with consistent with Vermont law. *State* v. *Lapham*, 135 Vt. 393, 402, 377 A.2d 249 (1977); *State* v. *Bishop*, 128 Vt. 221, 228, 260 A.2d 393 (1969).

An issue was raised in this case concerning prejudicial argument. Since we have so recently ruled on and condemned similar argument in *State* v. *Lapham, supra*, 135 Vt. at 406–08, 377 A.2d 249, we deem it unnecessary to treat the issue further in this case. Presumably, that argument will not be made to the jury on retrial.

However, there are on-going issues raised here that should be dealt with. One of them concerns the propriety of informing the jury as to the institutional disposition of the defendant should they find him not guilty by reason of insanity. Here, again, the problem of the public conception of a murderer set free is the issue.

The usual rule has been as announced in *State* v. *Goyet*, 120 Vt. 12, 53, 132 A.2d 623 (1957), where it was said that knowledge concerning punishment could not aid a jury in determining whether or not a defendant was guilty of the offense charged. *State* v. *Hood*, 123 Vt. 273, 276, 187 A.2d 499 (1963) was a case that sustained the refusal to charge concerning the probable consequences of a finding by the jury that the defendant was not guilty by reason of insanity. In so doing, this Court made clear its preference for this position but, in guarded language, indicated that if a trial court elected to embark on the perilous course of such a charge, it had a duty to give a full picture of the impact of relevant statutory provisions.

Experience since the *Hood* case has indicated that the middle ground so tentatively occupied is, in the main, troubled ground, fraught with both the high probability of error and subject to that kind of adversarial manipulation characterized as "wiley" in *State* v. *Hood, supra*, 123 Vt. at 276, 187 A.2d 499. We therefore declare a return to the more solidly founded rule that the disposition after verdict is for the court, and is not to be charged to the jury.

The defendant complains that the information as drawn in this case improperly joins two offenses in one count, contrary to V.R.Cr.P. 8(a). An examination of that information dis-

closes two counts: one charging only murder in the first degree based on a willful, deliberate and premeditated killing, with no reference to any other form of first degree murder, including any sort of felony murder. The second count is confined to the rape charge. There is no duplicity on the face of the information, and V.R.Cr.P. 8(a) is not violated.

What the defendant seems to be seeking to reach is that part of the trial court's charge that introduced the issue of felony murder without the support of a count in the information. But the defendant's objection to the court's charge in the felony murder rule ran only to the impropriety of coupling the murder to what the defendant contended was a different criminal episode involving the rape. Therefore, none of the issues briefed here relating to felony murder, including this one, were brought to the attention of the trial court. They therefore run afoul of V.R.Cr.P. 30 that says that they may not be assigned as error.

There remains only the claim that the trial court should have charged on what is coming to be known as "diminished capacity." This issue was before the trial court and may occur on retrial, therefore it is appropriate for review on this appeal.

Contrary to the position taken by the State, our cases do not limit the application of the "diminished capacity" doctrine to the use of intoxicants. Rather, the matter of intoxication has been noted as one area of its application, where supported by appropriate facts. *State* v. *Pease*, 129 Vt. 70, 76, 271 A.2d 835 (1970).

The concept is directed at the evidentiary duty of the State to establish those elements of the crime charged requiring a conscious mental ingredient. There is no question that it may overlap the insanity defense in that insanity itself is concerned with mental conditions so incapacitating as to totally bar criminal responsibility. The distinction is that diminished capacity is legally applicable to disabilities not amounting to insanity, and its consequences, in homicide cases, operate to reduce the degree of the crime rather than to excuse its commission. Evidence offered under this rubric is

relevant to prove the existence of a mental defect or obstacle to the presence of a state of mind which is an element of the crime, for example: premeditation or deliberation.

Since these states of mind are neither complex nor difficult to achieve, aside from special instances involving drugs, alcohol, injury or emotional frenzy, the issue frequently tends to reduce itself to situations involving lack of mental capacity itself. The issue is discussed in an annotation at 22 A.L.R.3d 1228 (1968). It is also the subject of a thoughtful exposition in A. Goldstein, *The Insanity Defense* at 191–207 (New Haven 1967).

■ For the purposes of the matter before us it is sufficient to say that where the evidence in any form supports it, a request to charge on the jury's duty to determine the existence of the states of mind required to establish the particular crime at issue in the light of any diminished capacity should be carefully reviewed by the trial court, and if appropriate, given. *State* v. *Audette*, 128 Vt. 374, 378, 264 A.2d 786 (1970).

*Reversed and remanded.*